UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JANE DOE 1, et al.,

                                  Plaintiffs,

          v.

COUNTY OF ROCKLAND, et al.,

                                  Defendants.

No. 21-CV-6751 (KMK)

AMENDED OPINION & ORDER

Appearances:

Steven A. Metcalf II, Esq.
Metcalf & Metcalf, P.C.
New York, NY
*Counsel for Plaintiffs*

Matthew R. Hughes, Esq.
Robert B. Weissman, Esq.
Saretsky Katz Dranoff Weissman & Maynard, LLP
Elmsford, NY
*Counsel for Defendants County of Rockland,*
*Rockland County Correctional Center, and*
*Rockland County Sheriff's Office – Corrections Division*

KENNETH M. KARAS, United States District Judge:

Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6 ( together,

"Plaintiffs"), formerly incarcerated at the Rockland County Jail (the "Jail"), bring the instant

Action pursuant to 42 U.S.C. §§ 1983, 1985, and 1988 and state law against the County of

Rockland, Rockland County Correctional Center, and Rockland County Sheriff's Office –

Corrections Division (together, the "County") and its employees Corrections Officer Christopher

Taggart ("Taggart"), Corrections Officer John Kezek ("Kezek"), Sergent Cooper, Corrections

Officer Gomez, Corrections Officer Mantello, Corrections Officer Ranolfo Ventillo, Corrections

Officer Charlie Mae, Corrections Officer Danny, Corrections Officer Kyle Farrison, Corrections

Officer Joseph Helchowski, Corrections Officer Starky, and John Does/Jane Does 1–6

(collectively, the "Individual Defendants").[1]  (*See* Second Am. Compl. ¶¶ 38–44 ("SAC") (Dkt.

No. 74).)[2]

Before the Court is the County's Motion to Dismiss the Second Amended Complaint

("SAC"), insofar as it pertains to the County, pursuant to Federal Rule of Civil Procedure

12(b)(6) (the "Motion").  (*See* Not. of Mot. to Dismiss (Dkt. No. 91).)  For the reasons stated

below, the Motion is granted in part and denied in part.

## I.  Background

### A.  Materials Considered

Plaintiffs have attached multiple exhibits to the SAC, (*see* SAC, Ex. Nos. 1–5 (Dkt.

Nos. 74-1 through 74-5)), while the County has submitted two declarations and accompanying

exhibits in support of their arguments, (*see generally* Decl. of Robert B. Weissman, Esq. in

Supp. of Mot. ("Weissman Decl.") (Dkt. No. 92); Reply Affirm. of Robert B. Weissman, Esq.

("Weissman Reply Affirm.") (Dkt. No. 103)).

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the

pleadings themselves," because "[t]o go beyond the allegations in the Complaint would convert

the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56." *Thomas v.*

*Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).

"Nevertheless, the Court's consideration of documents attached to, or incorporated by reference

---

[1] None of the Individual Defendants have yet appeared in this Action.  (*See generally* Dkt.)  The Court notes that although Plaintiffs occasionally spell Ventillo as "Vintello" in the SAC, (*e.g.*, SAC ¶¶ 214–15), the Court will refer to him solely as "Ventillo" to avoid confusion.

[2] Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper-right corner of each page in cites from the record.

in the Complaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.*; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety . . ., documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'" (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

Plaintiffs submitted the following documents as attachments to the SAC: (1) a September 3, 2021, letter from Amy L. Soloman, Acting Assistant Attorney General, to state governors, discussing state requirements to certify and assure compliance with the Prison Rape Elimination Act of 2003 ("PREA"), (SAC Ex. A (Dkt. No. 74-5)); (2) a list of PREA Certification and Assurance submissions from August 20, 2020, through August 19, 2021, (SAC Ex. B (Dkt. No. 74-1)); (3) a January 2023 special report from the U.S. Department of Justice, Bureau of Justice Statistics, titled "Substantiated Incidents of Sexual Victimization Reported by Adult Correctional Authorities, 2016–2018," (SAC Ex. C. (Dkt. No. 74-2)); (4) a September 11, 2020, news article from lohud.com titled "Rockland corrections officer John Kezek faces 78 additional charges for jail misconduct," (SAC Ex. D (Dkt. No. 74-3)); and (5) notices of claims filed in July 2023 on behalf of Jane Does One through Six against the Defendants in this Action, (SAC Ex. E (Dkt. No. 74-4)).

The Court may take judicial notice of these sources, as the County does not dispute their authenticity "and [they are] capable of accurate and ready determination." *O'Neill v. Standard*

*Homeopathic Co.*, 346 F. Supp. 3d 511, 519 n.2 (S.D.N.Y. 2018); *In re Chantix (Varenicline)*

*Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 735 F. Supp. 3d 352, 369 (S.D.N.Y. 2024)

(taking notice of facts "contained in the FDA's announcements . . ., as set forth in the Agency's

guidance documents and related statements on its official website"); *Wells Fargo Bank, N.A. v.*

*Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (observing that judicial

notice may be taken of an official government website, as "the website's authenticity is not in

dispute and 'it is capable of accurate and ready determination'" (quoting *Doron Precision Sys.,*

*Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006))).  The Court notes that even

though it takes judicial notice of these documents, "their purposes at the motion-to-dismiss stage

are limited," as they can only be used to "determin[e] what the documents state," not to "prove

the truth of their contents."  *Hesse v. Godiva Chocolatier, Inc*., 463 F. Supp. 3d 453, 463

(S.D.N.Y. 2020) (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

　　　The County, for its part, submitted the following documents in support of its Motion: (1)

the Jail's Code of Conduct, regarding the rules and regulations for uninformed staff, first issued

January 1, 2001, and amended October 7, 2014, (Weissman Decl. Ex. B (Dkt. No. 92-2)); (2) the

Jail's Code of Conduct as amended August 30, 2017, (Weissman Decl. Ex. C (Dkt. No. 92-3));

(3) the Jail's PREA policy, rules, and regulations enacted from 2002 to January 2012,

(Weissman Decl. Ex. D (Dkt. No. 92-4)); (4) the Jail's January 15, 2015, PREA policy, rules,

and regulations, (Weissman Decl. Ex. E (Dkt. No. 92-5)); (5) the Jail's Inmate Rules and

Regulations (Weissman Decl. Ex. F (Dkt. No. 92-6)); (6) Plaintiffs' acknowledgment of receipt

of rules and regulations, (Weissman Decl. Ex. G (Dkt. No. 92-7)); (7) an April 26, 2016, Felony

Complaint regarding Ranolfo Ventillo, (Weissman Decl. Ex. H (Dkt. No. 92-8)); (8) an

information filed on October 13, 2016, in connection with the County's prosecution of Ventillo,

(Weissman Decl. Ex. I (Dkt. No. 92-9)); (9) an arrest report from June 12, 2020, in connection

with the state prosecution of Christopher Taggart, (Weissman Decl. Ex. J (Dkt. No. 92-10)); (10)

a July 31, 2020, grand jury indictment of Taggart in connection with the same prosecution,

(Weissman Decl. Ex. K (Dkt. No. 92-11)); (11) an April 8, 2021, transcript of Taggart's guilty

plea and allocution, (Weissman Decl. Ex. O (Dkt. No. 92-15));[3] (12) a July 31, 2020, grand jury

indictment of John Kezek, (Weissman Decl. Ex. M (Dkt. No. 92-13)); (13) an arrest report from

August 5, 2020, in connection with the state's prosecution of Kezek, (Weissman Decl. Ex. N

(Dkt. No. 92-14)); (14) a December 22, 2021, transcript of Kezek's guilty plea and allocution,

(Weissman Decl. Ex. L (Dkt. No. 92-12)); and (15) an August 26, 2020, complaint filed in

*Santiago, et al. v. United States of America*, No. 20-CV-6887 (S.D.N.Y. 2020), (Weissman

Reply Decl. Ex. A (Dkt. No. 103-1)).

      As for the first six documents, the County argues that these documents are regulations

"promulgated by an administrative agency" and thus, are "a proper subject for judicial notice."

(County's Mem. of Law in Supp. of Mot. 16 n.3 ("County's Mem.") (Dkt. No. 93) (quoting Op.

& Order Granting Mot. to Dismiss Amend. Compl. 4 ("Op. & Order") (Dkt. No. 71)).)

Plaintiffs, however, dispute the relevance and authenticity of these exhibits, because, inter alia,

"Plaintiffs have been unable to explore whether such policies were even provided to each

Defendant," "whether such policies were trained and enforced at Defendants['] facility," the

policies "do[] not contain any indication or signature line that such policy was provided to any

[D]efendant, by any [D]efendant or staff member," and the policies they "do[] not contain the

---

[3] In its Declaration and on the docket, the County appears to have mislabeled Taggart's guilty plea and allocution transcript as Exhibit L, when the transcript is, in fact, Exhibit O. Conversely, Kezek's guilty plea and allocution transcript was mislabeled as Exhibit O when it is actually Exhibit L.

date Defendants were provided such policy, or trained on such policy." (Pls' Opp'n to Mot. to Dismiss 29–30 ("Pls' Opp'n") (Dkt. No. 99).)

Although a Court may take judicial notice of prison regulations when undisputed, *see Spurgeon v. Wettenstein*, No. 13-CV-8117, 2015 WL 1408874, at *2 n.1 (S.D.N.Y. Mar. 26, 2015) (taking notice of prison regulations); *Gray v. Erfe*, No. 13-CV-39, 2015 WL 3581230, at *2 n.1 (D. Conn. June 5, 2015) (same); *Lurry v. Ford*, No. 13-CV-1157, 2014 WL 859270, at *2 (D. Conn. Mar. 5, 2014) ("The court also may consider matters of which judicial notice may be taken, such as . . . prison directives." (citing *Christman v. Skinner,* 468 F.2d 723, 726 (2d Cir. 1972))), a court "cannot consider extrinsic evidence if there is a dispute 'regarding the authenticity or accuracy of the document' or 'the relevance of the document' to the dispute," *Hunter v. Kaufman Enters., Inc.*, No. 09-CV-5540, 2011 WL 3555809, at *4 n.4 (E.D.N.Y. Aug. 8, 2011) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)); *see, e.g.*, *Giraud v. Bd. of Educ., Newburgh Enlarged City Sch. Dist.*, No. 12-CV-1842, 2013 WL 3776242, at *5 (S.D.N.Y. July 17, 2013) ("[E]ven if a document is 'integral' to the complaint, a court may only consider it if there is no dispute regarding its authenticity, accuracy[,] or relevance." (citing *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). Moreover, the Court notes that although the SAC discusses the Jail's purported lack of training, lack of adequate polices or practices to comply with its PREA obligations, and lack of supervision, (*see, e.g.*, SAC ¶¶ 228, 291, 322–34), it "does not point to any express written policy, let alone any specific document in which the policies were contained," *Hunter*, 2011 WL 3555809, at *4 n.4. Accordingly, the Court will not take notice of Defendants' Exhibits A through G.

However, although Plaintiffs lodge a blanket objection to "all of Defendant[s'] Exhibits," they do not discuss the remaining documents submitted by Defendants (i.e., Exhibits H through

L) or explicitly dispute their relevance or authenticity. (*See* Pls' Opp'n 31.) The County has

argued that the Court may take judicial notice of these documents because the Taggart and

Kezek Allocutions are transcripts of public court proceedings and the arrest reports, grand jury

indictments, and Ventillo Complaint and Information are documents filed in a criminal case

before another court. (County's Mem. 13 n.2.) The Court agrees, as there is no genuine dispute

as to their authenticity and the Court "may take judicial notice of court filings." *Brooks v.

Westchester Cnty. Jail*, No. 19-CV-10901, 2021 WL 3292229, at *5 n.8 (S.D.N.Y. Aug. 2, 2021)

(citing *Linares v. Annucci*, No. 19-CV-11120, 2021 WL 2689736, at *1 n.2 (S.D.N.Y. June 30,

2021)); *see also O'Hara v. Cohen-Sanchez*, No. 22-CV-6209, 2023 WL 5979176, at *8 n.4

(E.D.N.Y. Aug. 28, 2023) ("The court may take judicial notice of state court filings." (citing

*Williams v. N.Y.C. Hous. Auth.*, 816 F. App'x 532, 534 (2d Cir. 2020))); *Monroe v. Myskowsky*,

No. 12-CV-5513, 2014 WL 496872, at *1 n.3 (S.D.N.Y. Feb. 6, 2014) ("The Court may consider

matters of which judicial notice may be taken under [Federal Rule of Evidence] 201, including

public records such as arrest reports, indictments, and criminal disposition data."). However, the

Court will consider the documents only for the fact that they exist, not the truth of the matters

asserted therein. *See Ferranti v. Arshack, Hajek & Lehrman PLLC,* No. 20-CV-2476, 2021 WL

1143290, at *3 (S.D.N.Y. Mar. 24, 2021) ("The [c]ourt may take judicial notice of a document

filed before another court and may consider such documents for the fact that they exist, but not

for the truth of the matters asserted therein." (citing *Roth*, 489 F.3d at 509)), *appeal withdrawn*,

No. 21-1245, 2021 WL 3575023 (2d Cir. June 23, 2021); *Hutchins v. Solomon*, No. 16-CV-

10029, 2018 WL 4757970, at *7 (S.D.N.Y. Sept. 29, 2018) (taking judicial notice of filings in a

court case submitted by a party "only to establish the fact of such filings and what they contained, not for the truth of the matter asserted therein" (citation omitted)).[4]

    B.  Factual Background

    The following facts are drawn from Plaintiffs' SAC and are taken as true for the purpose of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

    1.  PREA

    In 2003, Congress enacted PREA, which was designed to "provide for the analysis of the incidence and effects of prison rape . . . and provide information, resources, recommendations and funding to protect individuals from prison rape."  (SAC ¶ 45 (quotations omitted).)  As the County was allegedly aware, PREA provides that state governors must regularly certify to the U.S. Department of Justice ("DOJ") that "their jurisdiction is in full compliance" with PREA standards, or else be subject to the loss of five percent of certain DOJ funds.  (*Id.* ¶¶ 46–47.)  The County is also allegedly "fully aware of PREA federal law and its regulations," and of "the forms and procedures needed to be submitted to obtain and stay in PREA compliance with the DOJ."  (*Id.* ¶¶ 49, 51.)

    The County, which operates the Jail, (*id.* ¶ 60), was "responsible for the safety of the inmates at [the Jail] and responsible for creating and enforcing policies and practices that ensure the safety of the inmates at [the Jail]," (*id.* ¶ 73), including "preventing sexual abuse," (*id.* ¶ 70). Based on the enactment of PREA and various state laws, the County was "aware of the substantial risks of sexual abuse face[d] by female prisoners in [the Jail]," and "of the statistics

---

    [4] Although the County fails to offer any reason why the Court should consider the *Santiago* Complaint, (*see* Reply Mem. of Law in Supp. of Mot. to Dismiss 9 ("Reply") (Dkt. No. 102)), the Court nevertheless will consider it for the limited purpose of its existence based upon the same reasons discussed above.

that dictate sexual abuse is a pervasive problem," and further knew "that assigning male staff to guard female prisoners creates obvious risks of sexual abuse." (*Id.* ¶¶ 77–82.)

2. The Jail Policies

The Jail allegedly promulgates rules requiring random and unannounced supervisory rounds. (*Id.* ¶ 109.) However, supervisors typically conduct rounds only once a shift, and would not actually "do rounds,"—i.e., check on the inmates—but would instead "predominately only [stand]" for "less than ten minutes," "speak with the officers on the shift," take notes, and leave. (*Id.* ¶¶ 107, 109–10.) Plaintiffs allege that, upon information and belief, the Jail had no requirement that supervisors had to check in with each officer on duty, ask them particular questions, speak with the prisoners, or observe the entire area. (*Id.* ¶ 111.) After the reports of the Individual Defendants' misconduct, as detailed below, the Jail did not make any changes to its supervisory round practices. (*Id.* ¶ 117.)

Plaintiffs also allege that, upon information and belief, surveillance cameras were not installed through the Jail or, to the extent that they were installed, were inadequately monitored. (*Id.* ¶¶ 118–20.) Many areas of the Jail, including enclosed and isolated areas, were in "dead zone[s]" that were "completely outside of any video or audio surveillance." (*Id.* ¶ 119.) No staff member was assigned to view the cameras either "in real time" or shortly thereafter. (*Id.* ¶ 120.) Instead, video footage was only reviewed after an incident was reported. (*Id.* ¶ 121.)

The Jail employed approximately 120 male correctional officers and only approximately 8–10 female correctional officers. (*Id.* ¶ 105.) The Jail did not employ any female sergeants or supervisors. (*Id.*) Because of this staffing, the Jail permitted the assignment of male staff, including the Individual Defendants, to posts wherein they had "ample opportunity for unmonitored contact with female inmates, including Plaintiffs." (*Id.* ¶ 102.)

9

Each shift at the Jail was comprised of two male officers per shift. (*Id.* ¶ 105.) One officer would be in the control room "separate and apart from the pod," and one officer "was able to walk around to the pod and to various cell." (*Id.* ¶ 147.) This allowed the male staff to often be alone in areas with no surveillance cameras or other staff in range of visual contact. (*Id.*)

The Individual Defendants, all male employees of the County, were corrections officers at the Jail whose responsibilities included guarding inmates and supervising the guarding of inmates. (*Id.* ¶¶ 41–42.)

### 3. Jane Doe 1

On or about May 8, 2019, Jane Doe 1 was arrested for assault and incarcerated at the Jail. (*Id.* ¶ 153.) While at the Jail, Jane Doe 1 was only housed in the "F-wing" of the Jail, in the top level of a pod in individual "cell 14." (*Id.* ¶ 154.) Although Jane Doe 1's cell was located in a "dead zone," where there was no direct surveillance from security cameras or other staff or prisoners, there were many cameras throughout the pod and the control room. (*Id.* ¶¶ 155–56.)[5]

#### a. Taggart

In or around July 2019, Jane Doe 1 met Taggart, the assigned "pod officer" in the "F-wing" from 3:00 PM to 11:00 PM, who began to befriend her. (*Id.* ¶ 160.) As time went on, Taggart began conversing with Jane Doe 1 on a regular basis and would spend several hours during each shift in front of her cell speaking with her. (*Id.* ¶ 161.) Jane Doe 1 alleges that other inmates became upset because of the favoritism Taggart showed Plaintiff by spending too much time by her cell, which went on for "months on end." (*Id.* ¶ 162.) In or around August 2019, Jane Doe 1 alleges that the "normal conversations," with Taggart became "more personal and

---

[5] Jane Doe 1 alleges it was "common knowledge to everyone" that her cell was in a "dead zone." (*Id.* ¶ 165; *see also id.* ¶ 162.)

sexual" and, eventually, "directly sexual" with Taggart requesting to engage in oral sex with Jane Doe 1 and asking her "will you be my girlfriend?" (*Id.* ¶ 163.) Jane Doe 1 alleges that each of these "sexual conversations" took place when Taggart stood in front of her cell and conversed with her for "significant amounts of time." (*Id.* ¶ 164.) Jane Doe 1 alleges that, at some point, Taggart "went so far as letting her out of her cell to speak with him when his shift changed from working within the pod to working in the control room." (*Id.*)

On multiple occasions, Taggart brought in contraband for Jane Doe 1, including alcohol, food, and a burner phone which he used to speak with Jane Doe 1. (*Id.* ¶ 165.) Taggart also promised to keep Jane Doe 1's family "informed on how she was doing." (*Id.*) Jane Doe 1 alleges that after the fifth time Taggart brought contraband in for her, he began to ask "what she would do in exchange for him" continuing to bring in contraband. (*Id.*) Taggart allegedly began asking Jane Doe 1 to undress for him and, during cell inspections, to let him smell her underwear. (*Id.*) Jane Doe 1 also alleges that Taggart "would ask . . . to smell her urine, touch her underwear, [and] asked for her tampons to smell." (*Id.* ¶ 187.) Jane Doe 1 "obeyed [Taggart's] demands for her to disrobe," as she was in a "very vulnerable position" and unable to clearly see "just how much she was being taken advantage of." (*Id.* ¶ 166.)

Jane Doe 1 alleges that during and after her encounter with Kezek in November 2019, described below, Taggart continued to engage in an inappropriate relationship with her, including speaking to her about "sexually inappropriate" matters, asking her to disrobe, and entering her cell. (*Id.* ¶ 186.) Jane Doe 1 alleges that she was in "an extremely vulnerable position as a female prisoner who complained about a male officer being sexually inappropriate with [her]," and Taggart "fooled [Jane Doe 1] into thinking that [he] cared about [her] . . . . [and] attempted to begin an intimate relationship . . . [by] telling her how the two would be together

11

when [she] got out of jail." (*Id.* ¶ 185.)  Jane Doe 1 alleges that Taggart made Jane Doe 1 "feel

as if [he] was looking out for [her] safety and was protecting her against the harassment and

abuse from the other guards and staff."  (*Id.*)

In January 2020, Taggart was reprimanded and suspended following a review by the Jail

of the phone calls between him and Jane Doe 1.  (*Id.* ¶ 189.)  The facility began placing

additional security cameras that same month.  (*Id.*)  Jane Doe 1 alleges that in connection with

the allegations in this matter, Taggart was indicted in July 2020 on two felony counts of

promoting prison contraband and several misdemeanor counts of official misconduct.  (*Id.* ¶ 193;

Weissman Decl. Ex. K.)  Taggart pled guilty and was sentenced to two years of probation.  (SAC

¶ 193; Weissman Decl. Ex. O.)  As part of his plea deal, Taggart also had to resign as a

corrections officer.  (SAC ¶ 193; Weissman Decl. Ex. O.)

Jane Doe 1 alleges that the County "knew or should have known how [Taggart] did the

same thing with other woman prisoners in the past while these other women were housed" in the

Jail and "that [Taggart] was a person who utilized his position as a correction[s] officer to

manipulate exceptionally vulnerable female prisoners."  (SAC ¶¶ 190, 192.)  Jane Doe 1 also

alleges that other women with whom Taggart had relationships "learned about [Taggart's]

interest in [Jane Doe 1] and . . . have threatened [Jane Doe 1's] safety for even speaking with

[Taggart]."  (*Id.* ¶ 190.)

### b.  Kezek and John Doe 1

On November 27, 2019, Kezek and John Doe 1 were working the "day tour."  (*Id.* ¶ 168.)

John Doe 1 placed Jane Doe 1 on a shift lock—i.e., temporary confinement to one's cell—for

having a hair tie.  (*Id.*)  John Doe 1 also ordered Jane Doe 1 to clean the drains located in the

yard.  (*Id.*)  While Jane Doe 1 was cleaning the drains, Kezek made sexual remarks about her.

(*Id.* ¶ 169.)  After cleaning the drains, Jane Doe 1 was locked into her cell.  (*Id.*)  Kezek then

approached Jane Doe 1's cell and remarked that the pictures Jane Doe 1 had on her cell desk were the same photos that she had posted on her Instagram account. (*Id.*) Kezek then stated that he "did things to [Jane Doe's 1] photos on his time off[.]" (*Id.*) As he was making these statements to Jane Doe 1, Kezek became visibly erect. (*Id.*) Kezek and John Doe 1 then unlocked Jane Doe 1's cell door. (*Id.* ¶ 170.) Kezek stood in Jane Doe 1's cell doorway, took out his penis, and masturbated for 40 to 60 seconds. (*Id.*) After he finished, Kezek zipped his pants back up and closed the door behind him. (*Id.*) Following this incident, Jane Doe 1 began experiencing anxiety upon seeing Kezek. (*Id.*)

Jane Doe 1 alleges that this was the first time Kezek entered her cell but not the first time that Kezek had acted inappropriately in the pod. (*Id.* ¶ 171.) On numerous occasions, Jane Doe 1 alleges Kezek intervened in conversations that other inmates and Jane Doe 1 were having in the pod and made "inappropriate sexual comments[.]" (*Id.*) Jane Doe 1 alleges that on various occasions in the pod, Kezek: described, in graphic detail, sexual acts that he enjoyed; informed another inmate that he could help her masturbate; and stated he wanted to find a different inmate in town because he wanted to "tear her up." (*Id.*)

Jane Doe 1 alleges that she did not immediately report these incidents with Kezek and John Doe 1 because she "became . . . scared." (*Id.* ¶ 173.) On or about December 12, 2019, Jane Doe 1 reported the incident to the jail chaplain on December 12, 2019, who told a superior officer. (*Id.* ¶¶ 174–75.) Jane Doe 1 "quickly" noticed that lieutenants and sergeants "began treating [her] differently." (*Id.* ¶ 174.) On or about that same date, after Jane Doe 1 began experiencing anxiety attacks and having nightmares about being raped and stabbed, Jane Doe 1 reported the incident to her psychiatrists. (*Id.* ¶ 176.) On December 14, 2019, Jane Doe 1 submitted a formal complaint against Kezek. (*Id.* ¶ 179.)

Jane Doe 1 alleges that once "people" found out she had submitted a formal complaint, officers refused to provide Jane Doe 1 necessary daily supplies. (*Id.* ¶¶ 175, 180.) Additionally, Jane Doe 1 was "labeled a 'rat,' 'dub,' 'undercover[,]' an[d] many more inappropriate" names by several officers in English and Spanish in front of "the rest of the inmates." (*Id.* ¶¶ 175, 180–81.) Jane Doe 1 also alleges "word spread throughout the jail, fast" about the incidents, (*id.* ¶ 177), and Taggart approached Jane Doe 1 and told her that "other officers were making fun of Kezek in the locker room," (*id.* ¶ 178).

During this period, Jane Doe 1 was "subject to having to interact" with Kezek during each of his shifts. (*Id.* ¶ 182.) At some point, Kezek was moved from the F-wing but remained assigned to the women's wing of the Jail. (*Id.* ¶ 184.) Jane Doe 1 would "still see him if he came up and spoke to other officers[,]" which would "cause [Jane Doe 1] great anxiety . . . for [her] safety." (*Id.*) Jane Doe 1 alleges that the County's "failure to keep [Kezek] in a separate area from [her]" caused her anxiety and concern. (*Id.* ¶ 194.)

Following her formal complaints against Kezek, Jane Doe 1 grew "so anxious and fearful" that she contacted the District Attorney's Office to have her transfer facilities, but the Jail refused. (*Id.* ¶ 188.) On or about February 20, 2020, Jane Doe 1 was transferred to Orange County Jail. (*Id.* ¶¶ 188, 195.) Jane Doe 1 alleges that, after her transfer, "word" about her relationship with Taggart "spread[] fast," and she was again labeled "a rat" and received threats from "other women who thought they were in a relationship with [Taggart]." (*Id.* ¶ 195.) This caused Jane Doe 1's fear for her safety "to be present and very real, every day." (*Id.*) Jane Doe 1 was released on her own recognizance from Orange County Jail on July 8, 2020. (*Id.* ¶ 157.)

Kezek was indicted in July 2020 on five counts of official misconduct in connection with these incidents, to which he pled guilty. (Weissman Decl. Exs. L–M.)

4. <u>Jane Doe 2</u>

Jane Doe 2 was incarcerated at the Jail from around September 2014 until her release in 2017. (*Id.* ¶ 196.) Jane Doe 2, who was only eighteen at the time of her incarceration, soon learned that "the correction[s] officers who had been hired to protect her . . . posed the greatest threat," and would "use[] their position of power to force female[ inmates] . . . into performing sexual benefits." (*Id.* ¶¶ 197–98.) Jane Doe 2 alleges that if she refused the officers' demands, she would get harassed by the Individual Defendants and other officers, who made her time in jail "miserable" and told her that "officers would go out of their way to penalize her for rules that other women were also breaking." (*Id.* ¶ 201–02.) At first, the threats were minor, such as not being allowed an extra blanket if she did not comply, but they escalated to threatening to lock her in her cell for "23 hours a day," essentially solitary confinement. (*Id.* ¶¶ 203–04.)

In or around January 2015, John Doe 2 approached Jane Doe 2 and said, "show me the brownies"—meaning her breasts—for which he would put money in her commissary so that she could call her mother. (*Id.* ¶ 210.) Jane Doe 2, who had not had any contact with her mother since being incarcerated, was "lonely and desperate" and "apprehensively" complied. (*Id.* ¶ 211.) The next day, Jane Doe 2 received money in her commissary account. (*Id.*)

At some point in or around 2014–2015, Jane Doe 2 was placed in cell block 19, which is a "dead zone" without any surveillance. (*Id.* ¶ 214.) John Doe 2 pretended that Jane Doe 2 had requested something so he could open the slot on her cell. (*Id.* ¶ 214.) He then demanded that Jane Doe 2 place her vagina by the slot so that Ventillo could "play with" it; after Jane Doe 2 did so, Ventillo penetrated her. (*Id.* ¶ 215.) This occurred on three occasions. (*Id.* ¶¶ 215, 227.)[6] On another occasion, Ventillo stood in the door of Jane Doe 2's cell, where he forced Jane Doe 2

---

[6] The SAC is unclear on whether John Doe 2 participated in all three occasions or only one, or whether John Doe 2 is, in fact, Ventillo. (*See id.* ¶¶ 214–16.)

to stroke his penis while he penetrated her vagina for a fourth time. (*Id.* ¶¶ 216, 227.)[7]  Jane Doe

2 further alleges, on more than one occasion between February 2015 and June 2015, other

officers demanded Jane Doe 2 "play with herself for the officer's personal sexual pleasure." (*Id.*

¶ 218.)  Jane Doe 2 was released from the Jail in or about 2017. (*Id.* ¶ 219.)  In or about

September 2019, she was rearrested and reincarcerated at the Jail. (*Id.* ¶ 220.)  When she arrived

back at the jail, Kezek approached Jane Doe 2 and made sexually harassing comments to her

before demanding that she flash him. (*Id.* ¶ 221.)[8]

     Jane Doe 2's second period of incarceration lasted approximately 30 days. (*Id.* ¶ 222.)

During that time, she again witnessed female inmates being directed to flash officers and play

with themselves, at approximately the same rate of frequency as during her first period of

incarceration. (*Id.* ¶¶ 222–23.)

     5.  <u>Jane Doe 3</u>

     Jane Doe 3 was "sporadically" incarcerated at the Jail from in or about 2012 until in or

about 2016. (*Id.* ¶ 229.)  Jane Doe 3 alleges that, during her time at the Jail, Farrison "engaged

in unlawful sexual acts" and "sexually inappropriate behavior" with her. (*Id.* ¶¶ 232–33.)

Specifically, about three to four times a week, Farrison forced Jane Doe 3 to remove her

underwear, "show him her naked body," and touch herself while he locked her in her cell. (*Id.*

¶ 234.)  If Jane Doe 3 "failed to comply[,] she would be locked in her cell," so she "complied out

of pure survival." (*Id.* ¶ 235.)  Jane Doe 3 also alleges she was "offered contraband such as

Xanax and privileges in exchange for her sexual acts." (*Id.*)

---

[7] Jane Doe 2 alleges that, upon information and belief, Ventillo was arrested in 2016 in connection with the death of another female inmate who overdosed on the heroin that Ventillo provided her in exchange for sexual favors. (*Id.* ¶ 217; Weissman Decl. Ex. H.)

[8] Jane Doe 2 was later a complaining victim in Jane Doe 1's criminal cases against Kezek. (*Id.* ¶ 224.)

In 2016, Jane Doe 3 was released from custody and released into "sheriff's work," where she was required to participate in supervised community service as part of her sentence. (*Id.* ¶¶ 230–31.) During this work, Farrison touched her, "grabb[ing] her butt and legs on several occasions." (*Id.* ¶ 240.) Farrison also obtained Jane Doe 3's home address information from the facility database and came to Jane Doe 3's house once she was released. (*Id.* ¶ 241.) Jane Doe 3 alleges that, after her release, Farrison "forced her to have sex[] against her will." (*Id.* ¶ 242.)

### 6.   Jane Doe 4

Jane Doe 4 was incarcerated sporadically in the Jail from in or about 2012 until in or about 2018. (*Id.* ¶ 243.) During her incarceration, Helchowski "sexually harassed" and "engaged in unlawful sexual acts" and "sexually inappropriate behavior" with Jane Doe 4. (*Id.* ¶¶ 244–47.) Specifically, Helchowski forced Jane Doe 4 to "flash him each and every time he walked by her cell," which occurred at least three or four times a week. (*Id.* ¶ 248.) Helchowski was allegedly aware Jane Doe 4 had a drug abuse problem, and "capitalized on [her] vulnerability." (*Id.*)

Jane Doe 4 also alleges that John Doe 5, the son of one of the Jail supervisors, "sexually harassed" her and "engaged in unlawful sexual acts" and "sexually inappropriate behavior" with her. (*Id.* ¶¶ 249–52.) Jane Doe 4 avers that, beginning in 2012 and continuing through the duration of her first period of incarceration at the Jail, John Doe 5 would force Jane Doe 4 to touch his penis. (*Id.* ¶ 252.) This contact occurred outside Jane Doe 4's jail cell. (*Id.*) Jane Doe 4 complied out of "pure survival," as she feared "repercussions for non-compliance," especially given that John Doe 5's father was a supervisor. (*Id.* ¶ 253.)

### 7.   Jane Doe 5

Jane Doe 5 was incarcerated at the Jail in 2019. (*Id.* ¶ 260.) During this time, John Doe 1 sexually harassed Jane Doe 5 and "engaged in sexually inappropriate behavior with her,"

17

forcing Jane Doe 5 to "touch herself and flash him," which occurred consistently during her time at the Jail.  (*Id.* ¶¶ 260–62.)[9]  If Jane Doe 5 did not do so, she would be locked in her cell.  (*Id.* ¶ 263.)  Jane Doe 5 "complied out of pure survival" and was also offered "contraband" and "privileges" in exchange for performing sexual acts.  (*Id.*)  Jane Doe 5 also avers that, upon information and belief, the Individual Defendants would obtain female inmates' addresses and names from the Jail computer system and use that information against them once the inmates were released.  (*Id.* ¶ 264.)  Jane Doe 5's fear that this would occur to her compelled her to comply with John Doe 1's demands.  (*Id.* ¶ 265.)

       8.  <u>Jane Doe 6</u>

Jane Doe 6 was incarcerated in the Jail for the first time in September 2017 and for a second time in or about October 2019.  (*Id.* ¶ 268.)  Consistently throughout Jane Doe 6's first period of incarceration, John Does 2, 3, and 4 engaged in "sexually inappropriate behavior" with Jane Doe 6, forcing her to flash them, engage in intimate conversations with them, and "act as if she were in relationships with [them.]"  (*Id.* ¶ 270–71.)  John Does 2 through 4 would then "use[] such a false relationship to progress into sexually inappropriate behavior."  (*Id.* ¶ 271.)  Jane Doe 6 complied out of "pure survival," as if she failed to comply, she would be locked in her cell.  (*Id.* ¶¶ 272–73.)  Jane Doe 6 was also offered "contraband as privileges in exchange for her sexual acts"; John Does 2 through 4 would then deliver her the contraband.  (*Id.* ¶ 274.)

---

[9] Jane Doe 5 alleges that John Doe 1 was also known as "Ken Doll."  (*Id.*)  However, elsewhere in the SAC, Plaintiffs allege that "Ken Doll" was John Doe 3, not John Doe 1.  (*See id.* ¶¶ 43, 207.)  Given the apparent confusion, the Court will only refer to the respective John Does by their numbers, not their nicknames.

    Jane Doe 5 also alleges that Farrison "engaged in sexually inappropriate behavior with her," but provides no further details about his specific behavior.  (*Id.* ¶ 261.)

Jane Doe 6 also alleges that, during her second period of incarceration, in 2019, Kezek subjected her to "sexually inappropriate behavior" and made numerous jokes to her about the size of his genitalia.  (*Id.* ¶ 275.)

### 9.   The Culture of the Jail

Jane Doe 1 alleges that the type of "sexual harassment and abuse" she experienced were "widespread," and that it was "the culture of the facility[] for many officers to . . . make inappropriate sexual comments both directly and indirectly to inmates."  (*Id.* ¶ 172.) Specifically, Jane Doe 1 alleges that an unidentified officer from another section of the jail would "casually come by" to "check out the inmates" and make sexually inappropriate comments about "intimate parts" of their bodies, and that another unidentified officer would call female inmates derogatory names linked to their gender and threaten sexual violence against them if they "didn't lock in."  (*Id.*)  Jane Doe 1 avers that "superior officers failed to protect [her] from continued harassment . . . [and] [o]fficers [were] not held accountable for flagrant and constant sexual[ly] harassing comments[,] . . .[as] disciplinary actions [were] never taken."  (*Id.* ¶ 183.)

Jane Doe 2 alleges that, during her time in the Jail, she "frequently" saw officers pass by the female inmates' cells and "ask the women to flash their breast[s] to the officers if they wanted certain treatment," such as the officer putting money in the inmate's commissary account.  (*Id.* ¶ 199.)  Individual Defendants would give contraband or benefits to the inmates in exchange for sexual favors, ranging from "Dunkin Donuts, extra supplies, monies on your commissary, and turning a blind eye to any medicinal abuse."  (*Id.* ¶ 200.)  Jane Doe 2 alleges that she witnessed the Individual Defendants going after drug addicts specifically, as they were "especially vulnerable and would do anything for an officer if they agreed to get them drugs." (*Id.* ¶ 206.)  Jane Doe 2 also witnessed "frequent sexual abuse," up to five times a shift, three

shifts a day.  (*Id.* ¶ 209.)  She witnessed officers come up to other female inmates' cells and "demand that [they] play with themselves in a way the officers could watch."  (*Id.* ¶ 212.) During her time at the Jail, Jane Doe 2 realized that the officers all had a code—"Mess with one, then you mess with them all."  (*Id.* ¶ 208.)

Jane Does 3, 4, 5, and 6 also allege that during their incarceration, they witnessed other inmates endure similar abuse, as the "culture of the facility" was for officers—a "majority" of whom participated in this behavior—to walk by inmates' cells and "have the inmates flash [the officers] or speak with them intimately."  (*Id.* ¶¶ 237–38, 258, 266, 276.)  Jane Does 3, 4, 5, and 6 also aver that, upon information and belief, many of the inmates were "asked to disrobe and told to gratify . . . themselves for the officers['] . . . sexual pleasure."  (*Id.* ¶¶ 239, 259, 267, 277.)

C.  Procedural History

The Court discussed the procedural background of this Action in a previous Opinion. (*See* Op. & Order.)  The Court therefore assumes familiarity with the dispute and describes subsequent proceedings only as relevant to deciding the instant Motion.

On October 23, 2023, Plaintiffs filed a SAC, adding for the first time Jane Does 2 through 6 as Plaintiffs.  (*See* SAC.)  On December 12, 2023, after requesting and receiving additional time to respond to the SAC, the County submitted a letter requesting to file a Motion to Dismiss.  (*See* Dkt. Nos. 75–76; Letter from Robert B. Weissman, Esq. (Dkt. No. 77).)  After multiple requests for additional time, which were granted, Plaintiffs filed their response on January 18, 2024.  (*See* Dkt. Nos. 78–81; Letter from Steven A Metcalf, Esq. (Dkt. No. 82).) After holding a pre-motion conference on February 7, 2024, the Court set a briefing schedule. (*See* Dkt. (minute entry for Feb. 7, 2024); Scheduling Order (Dkt. No. 84).)  The briefing schedule was later modified after requests from the County.  (*See* Dkt. Nos. 85–90.)

On May 3, 2024, the County submitted its Motion to Dismiss the SAC and accompanying papers.  (Not. of Mot. to Dismiss; County's Mem; Weissman Decl.)  After requesting and receiving multiple extensions, (Dkt. Nos. 94–98), Plaintiffs filed their Opposition on August 1, 2024.  (Pls' Opp'n.)  The County filed its Reply on September 16, 2024, after requesting and receiving yet another extension.  (Dkt. Nos. 100–01; Reply; Weissman Reply Affirm.)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.,* 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

    B.  Analysis

        1.  Counts One, Two, and Four

Plaintiffs allege claims against Defendants based on violations of the Eighth, Fourteenth, and Fourth Amendments. (SAC ¶¶ 278–303, 357–67.) However, as the Court held in its prior Order, these claims are defectively pled because they allege liability directly under the Constitution, and there is no such direct cause of action for damages under the Constitution. (*See* Op. & Order at 17–18, n.11 (citing *Runge v. Collins*, No. 99-CV-9639, 2000 WL 726502, at *2 (S.D.N.Y. May 22, 2000) (explaining that "[v]iolations of an individual's constitutional rights by

a [g]overnment official are actionable under 42 U.S.C. § 1983, rather than directly under the

United States Constitution")).)  Thus, Plaintiffs' first, second, and fourth causes of action fail as

a matter of law and must be dismissed.[10]  However, because the SAC incorporates Plaintiffs'

allegations as to the Eighth and Fourteenth Amendment claims into their third cause of action

under 42 U.S.C. § 1983, the Court reads the SAC as alleging those claims and considers the

merits of those claims below, in connection with Plaintiffs' *Monell* claims.[11]

### 2.  Jane Doe 2 Through 6: Remaining Federal Claims

The County argues that, apart from those asserted by Jane Doe 1, all of the remaining

federal claims are time barred.  Specifically, the County argues that the federal claims asserted

by Jane Does 2 through 6 are time barred by the three-year statute of limitations for §§ 1983 and

1985 claims, and the one-year statute of limitations for § 1986 claims.  (County's Mem. 22.)

Further, the County argues that these federal claims cannot be revived by the Adult Survivors

Act, New York Civil Practice Law and Rules Law § 214-j (the "ASA").  (*Id.* at 23.)  The Court

agrees.

While Section 1986 has a strict one-year statute of limitations, *see* 42 U.S.C. § 1986, for

§§ 1983 and 1985 actions, "the applicable limitations period is found in the general or residual

state statute of limitations for personal injury actions," *Pearl v. City of Long Beach*, 296 F.3d 76,

79 (2d Cir. 2002) (citation and quotation marks omitted) (alterations adopted).  Here, New

---

[10] Plaintiffs argue, without more, that these claims are "properly plead" because they
alleged violations of their due process rights.  (Pls' Opp'n 32.)  Plaintiffs again miss the point.  It
is not enough to allege a constitutional violation in an action seeking only damages; one must
also bring the allegations in a suitable vehicle—i.e., under § 1983.  *See Runge*, 2000 WL 726502,
at *2 (citing *Monroe v. Pape*, 365 U.S. 167, 172 (1961)).  Plaintiffs were given ample notice and
opportunity to cure this deficiency and have failed to do so here.

[11] Because the SAC does not incorporate Plaintiffs' Fourth Amendment challenge into
their § 1983 claim, that count is dismissed for the reasons stated above.

York's three-year statute of limitations for personal injury actions applies. *Id.* (citing, inter alia, N.Y. C.P.L.R. § 214(5)); *see also Fairley v. Collins*, No. 09-CV-6894, 2011 WL 1002422, at *3 (S.D.N.Y. Mar. 15, 2011) (same). The question of when §§ 1983, 1985, and 1986 claims accrue is a "question of federal law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). "[A]ccrual occurs when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pearl*, 296 F.3d at 80 (citation and quotation marks omitted); *Paige v. Police Dep't of City of Schenectady*, 264 F.3d 197, 200 (2d Cir. 2001) ("[A] § 1983 claim accrues when the alleged conduct has caused the claimant harm and the claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm." (internal quotation marks and citation omitted)); *see Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) (noting § 1985 claims accrue once the plaintiff knows or has reason to know of the injury forming the basis of the action); *see Young v. Lord & Taylor, LLC*, 937 F. Supp. 2d 346, 354 (E.D.N.Y. 2013) (same, in the context of a § 1986 action). Put differently, accrual occurs when the plaintiff has "a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Wallace*, 549 U.S. at 388 (citations and quotation marks omitted).

As alleged, Jane Doe 2 was incarcerated "on and off" from September 2014 through 2017, and again briefly in 2019, (SAC ¶¶ 196, 225); Jane Doe 3 was incarcerated from 2012 through 2016, (*id.* ¶¶ 229–30); Jane Doe 4 was incarcerated from "2012 until in or about 2018," (*id.* ¶ 243); Jane Doe 5 was incarcerated "[d]uring the year of 2019," (*id.* ¶ 260); and Jane Doe 6 was incarcerated in September 2017 and again "in or about October 2019," (*id.* ¶ 268). Jane Does 2 through 6's claims accrued, at the very latest, by their release from incarceration. Thus, their §§ 1983 and 1985 claims expired, at the latest, three years after their respective releases (i.e., expiring between 2019 and 2022) and their § 1986 claims expired one year after release

(i.e., expiring between 2017 and 2020).  Because Jane Does 2 through 6 were not joined in this lawsuit until the filing of the SAC in October 2023, their claims are thus time barred and must be dismissed.  *See Wheeler v. Slanovec*, No. 16-CV-9065, 2019 WL 2994193, at *7–8 (S.D.N.Y. July 9, 2019) (granting motion to dismiss on the grounds that plaintiffs' claims are time-barred).

Plaintiffs do not dispute that these claims are time barred but instead assert that they should gain the benefit of equitable tolling, as they feared retaliation if they filed suit against Defendants.  (Pls' Opp'n 42–43.)  While the Court is sympathetic to this claim, the law does not support it.

Under federal law, equitable tolling of the statute of limitations is applied "only in 'rare and exceptional circumstances,' where . . . 'extraordinary circumstances' prevented a party from timely performing a required act."  *Davis v. Jackson*, No. 15-CV-5359, 2016 WL 5720811, at *9 (S.D.N.Y. Sept. 30, 2016) (quoting *Deraffele v. City of New Rochelle*, No. 15-CV-282, 2016 WL 1274590, at *11 (S.D.N.Y. Mar. 30, 2016)); *see also Moses v. Westchester Cnty. Dep't of Corr.*, 951 F. Supp. 2d 448, 454 (S.D.N.Y. 2013) ("[C]ourts in th[e] [Second] Circuit deciding [§] 1983 claims have applied the federal equitable tolling standard, which allows tolling where extraordinary circumstances prevented a party from timely performing a required act." (internal quotation marks omitted)).  "Equitable tolling is generally not available where the circumstances that a plaintiff claims prevented h[er] from timely filing were within the plaintiff's control."  *Davis*, 2016 WL 5720811, at *9 (quoting *Myers v. New York*, No. 14-CV-1492, 2016 WL 2636295, at *5 (N.D.N.Y. May 9, 2016)); *see also Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (finding that equitable tolling was not available where pro se litigant's delay in filing his § 1983 action appeared to be entirely within his control).  Moreover, "[t]he party asserting that equitable tolling applies must have 'acted with reasonable diligence throughout the period

[s]he [sought] to toll.'"  *Myers*, 2016 WL 2636295, at *5 (quoting *Doe v. Menefee*, 391 F.3d 147,

159 (2d Cir. 2004)).  "[A] plaintiff bears the burden of establishing that equitable tolling of her

claims is appropriate."  *Id.*  However, "[t]o secure equitable tolling, it is not enough for a party to

show that [s]he experienced extraordinary circumstances.  [Sh]e must further demonstrate that

those circumstances caused h[er] to miss the original filing deadline."  *Harper v. Ercole*, 648

F.3d 132, 137 (2d Cir. 2011); *see also Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 527

(S.D.N.Y. Mar. 26, 2015) ("[T]o benefit from equitable tolling, a litigant must allege that

extraordinary circumstances prevented h[er] from acting in a timely manner." (internal quotation

marks omitted)).

 Plaintiffs have failed to show such extraordinary circumstances here.  Although Plaintiffs

acknowledge that retaliation is typically an insufficient basis for equitable tolling, they argue that

tolling should nevertheless apply because the "prison context establishes 'a real and ever-present

force in an inmate's life' which 'can reasonably be said to be outside of an inmate-plaintiff's

control.'"  (Pls' Opp'n 43 (quoting *Davis*, 2016 WL 5720811, at *11).)  But Plaintiffs overlook

that not "every inmate is entitled to equitable tolling merely because [s]he resides in an

environment that intrinsically works to [her] disadvantage," as "[g]eneralized allegations of fear

of retaliation . . . are not sufficient to establish 'extraordinary circumstances.'"  *Davis*, 2016 WL

5720811, at *11.

 As the County points out, even if the Court assumes that Plaintiffs allege sufficient facts

suggesting they had a legitimate fear of retaliation if they reported their claims of sexual abuse

while incarcerated, once Jane Does 2 through 6 were released from incarceration—when all of

their claims would still have been timely—they were "no longer under the 'substantial control'

of the defendant correction officers and supervisory officials, and accordingly no longer subject

to the 'unique psychological environment' of incarceration." *Stone #1 v. Annucci*, No. 20-CV-1326, 2021 WL 4463033, at *12 (S.D.N.Y. 2021) (quoting *Davis*, 2016 5720811, at *10–11). There are no specific facts alleged in the SAC suggesting Jane Does 2 through 6 had a credible basis to fear retaliation after their release, let alone any facts suggesting that they did, in fact, fear retaliation at that point.[12] *See id.* (finding plaintiff did not allege facts establishing a "specific and credible basis to fear retaliation once she was released from prison"); *Pratt v. Stop & Shop Supermarket Co., LLC*, No. 09-5417, 2011 WL 579152, at *5 (E.D.N.Y. Feb. 9, 2011) ("[P]laintiffs['] generalized allegations of fear are insufficient to warrant equitable tolling." (citation omitted)).

Moreover, even if Plaintiffs alleged sufficient facts to suggest a specific and credible basis to fear retaliation post incarceration, they have not established another element of equitable tolling—that they pursued their claims with due diligence. *Myers*, 2016 WL 2636295, at *5–6. Because Plaintiffs allege no facts suggesting they sought any protection from the purportedly feared retaliation, "the Court would be hard pressed to conclude that Plaintiff[s] exercised reasonable diligence in pursuing [their] rights if, for the entire time Plaintiff[s] allege[] [they] faced a threat of retaliation, [they] did nothing to seek protection from that threat of retaliation." *Davis*, 2016 WL 5720811, at *11; *see also Doe v. USA*, No. 19-CV-1649, 2024 WL 4224467, at * 6 (D. Conn. Sept. 12, 2024) (finding a plaintiff did not act with reasonable diligence in pursuing her rights where "[p]laintiff had ample time, opportunity, and access to many other people who could have safely assisted her prior to . . . the latest arguable accrual date for her

---

[12] Indeed, the opposite inference can be drawn at least as to Jane Doe 5, who, in August 26, 2020, sued a correctional officer at another facility for sexual abuse. (*See* Reply Weissman Reply Decl. Ex. A, ¶¶ 89–102.) Although this says nothing about Jane Doe 5's fear of retaliation from the officers in *this* Action, it does suggest that she was able to file suit as of that point.

claims"), *appeal pending*, No. 24-2374 (2d Cir. Sept. 11, 2024); *Clark v. Hanley*, No. 18-CV-1765, 2022 WL 124298, at *5–6 (D. Conn. Jan. 13, 2022) (finding equitable tolling based on a fear of retaliation was not warranted where plaintiff never reported any behavior by defendants that led to her fear despite opportunities to do so), *aff'd*, 89 F.4th 78 (2d Cir. 2023). Accordingly, the Court concludes that Jane Does 2 through 6 cannot equitably toll their federal claims.

Further, to the extent Plaintiffs are attempting to revive their federal claims by way of the ASA, (*see* Pls' Opp'n 42), they are unsuccessful. The ASA "created a one-year revival period, starting November 24, 2022, during which adult survivors of sexual assault could sue their abusers despite the expiration of the previously applicable statutes of limitation." *Johnson v. NYU Langone Health*, No. 22-CV-9456, 2023 WL 6393466, at *2 (S.D.N.Y. Sept. 30, 2023) (citation omitted). The Second Circuit has not yet considered whether the ASA can revive §§ 1983, 1986, or 1986 claims. However, it recently held that a nearly identical revival statute pertaining to victims under eighteen years old does *not* revive § 1983 claims. *See Kane v. Mount Pleasant Central Sch. Dist.*, 80 F. 4th 101, 108 (2d Cir. 2023). The Second Circuit reasoned that per Supreme Court precedent, "federal interests in uniformity, certainty, and the minimization of unnecessary litigation" require a single statute of limitations for §1983 claims—i.e., state personal injury statutes. *Id.* at 107 (quoting *Wilson v. Garcia*, 471 U.S. 261, 275 (1985)). Accordingly, the "application of [state] tort-specific revival or tolling provisions" would frustrate those interests and cause confusion. *Id.* at 109. In so holding, the Second Circuit noted that "every United States Court of Appeals to address this issue thus far has determined that a specialized statute for sexual abuse claims does not render an otherwise untimely Section 1983 . . . timely." *Id.* (collecting cases).

Although Plaintiffs argue that the "facts and circumstances [here] are unique and consistent with the underlying policies" behind the ASA, (Pls' Opp'n 42), the Court finds *Kane*'s reasoning persuasive and concludes that the same reasoning applies to the ASA, *see Doe v. Columbia Univ.*, No. 23-CV-10393, 2024 WL 4149252, at *11 n.6 (S.D.N.Y. Sept. 11, 2024) (stating, after plaintiff's concession that the ASA did not revive his federal claims, "[t]here is no authority for the proposition that the ASA revives other federal claims," but noting that "the most direct guidance from the Second Circuit is that the analogous New York Child Victims Act, ('CVA') does not" (citing *Kane*, 80 F. 4th at 104)); *Austin v. Fordham Univ.*, No. 21-CV-6421, 2022 WL 4626485, at *11 n.6 (S.D.N.Y. Sept. 30, 2022) ("[T]he Court is not persuaded that [the ASA] will have any impact on the statute of limitations and tolling analysis" in the Title IX context, as "[c]ourts that considered revival claims under an analogous statute, the [CVA], found that the Act did not extend the statute of limitations for federal § 1983 claims.").[13]

---

[13] Moreover, even if the ASA did revive §§ 1983, 1985, and 1986 claims, it would not be able to revive the claims of Jane Does 5 and 6, whose claims cannot be revived even solely under state law. "For a claim to be revived pursuant to the ASA, a defendant's underlying conduct must 'constitute a sexual offense as defined in article one hundred thirty of the penal law.'" *Johnson*, 2023 WL 6393466, at *2 (quoting N.Y. C.P.L.R. 214-j). The SAC relies upon New York Penal Law §§ 130.65, 130.60, and 130.55—sexual abuse in the first, second, and third degrees, respectively. (*See* SAC ¶¶ 403, 409, 414.) As the County points out, each of these offenses requires that the perpetrator subject another person to "sexual contact," which is defined as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party" and "includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed." N.Y. Penal L. § 130.00(3). Thus, claims that do not include some type of physical touching—such as those alleged by Jane Does 5 and 6—are not revived by the ASA. *See Johnson*, 2023 WL 6393466, at *2–3 (concluding that claims that included no allegations of "forcible touching" as required by the relevant Penal Law could not be revived); *Leib-Podry v. Tobias*, No. 22-CV-8614, 2024 WL 1421152, at *8–9 (S.D.N.Y. Feb. 13, 2024) (finding that the ASA did not apply because the claim "d[id] not allege anything that would constitute a sexual offense under NY CPL [§] 130"), *report and recommendation adopted*, 2024 WL 1134597 (S.D.N.Y. Mar. 15, 2024), *appeal dismissed*, No. 24-1248 (2d Cir. July 21, 2024). Although Plaintiffs argue that the County "fails

### 3. *Monell* Claims (Counts Three, Five, and Six)

The Court next turns to Jane Doe 1's *Monell* claims against the County (Counts Three, Five, and Six) based on violations of her rights under the Fifth, Eighth, and Fourteenth Amendments. (SAC ¶¶ 305–21, 368–80.) The County argues that Jane Doe 1's claims must be dismissed because she has not adequately alleged either a widespread custom or practice that subjected her to a deprivation of her Constitutional rights or a failure to train or supervise to the extent that it amounted to deliberate indifference to Jane Doe 1's rights. (County's Mem. 27–33.) Jane Doe 1 argues that, drawing all inferences in her favor, she has alleged sufficient indicia of a widespread pattern such that "policy-makers must have been aware yet inadequately responded." (Pl's Opp'n 32–39.)

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived [her] of a federal constitutional or statutory right." *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013). "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Thus,

> to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury.

*Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (recommending dismissal of a

---

to sufficiently demonstrate that touching under the direction and coercion . . . of one['s] self and the conduct alleged is insufficient" to be revived under the ASA, Plaintiffs offer no support detailing why such conduct *would* be sufficient to overcome the Penal Law's clear statutory language. (*See* Pls' Opp'n 44.)

claim against agencies where plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester County*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Apr. 16, 2010) (recommending dismissal of a claim against a county because the complaint "does not allege the existence of an unconstitutional custom or policy"), *adopted as modified sub nom. Arnold v. Westchester Cnty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010). The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong" (emphasis in original)). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). A plaintiff may satisfy the "policy

or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

Generally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). In the end, therefore, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe*, 542 F.3d at 37 (quoting *Brown*, 520 U.S. at 404); *see also Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between [for example] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis in original)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of

liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

a. Widespread Practice or Custom

Jane Doe 1 argues that she has adequately pled the existence of a widespread practice or custom of tolerating sexual harassment and abuse, as she alleges the Jail had a "custom of allowing one male officer to supervise females without cameras and the ability to deter other officers," (*see* SAC ¶¶ 343–56), which led to "almost a decade of abuse that can be accounted for, on a daily basis, by multiple officers who were trading contraband and privileges for sexual acts," (Pl's Opp'n 39). Jane Doe 1 does not allege that there is any formal policy underlying this abuse, but instead, that it is so common as "to support an inference that [supervisors] had a policy, custom or usage of acquiescence in such abuse." (*Id.* at 38 (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012)).)

To establish *Monell* liability based upon a "persistent and widespread" practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be "'so manifest as to imply the constructive acquiescence of senior policy-making officials.'" *Lucente v. County of Suffolk*, 980 F.3d 284, 297–98 (2d Cir. 2020) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) ("[A] plaintiff must prove that the custom at issue is permanent and well-settled." (citing *Praprotnik*, 485 U.S. at 127)). "[A] custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]." *Bowen v. County of*

*Westchester*, 706 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (quoting *Newton v. City of New York*,

566 F. Supp. 2d 256, 270–71 (S.D.N.Y. 2008)); *see also Tuttle*, 471 U.S. at 823–24; *Sorlucco*,

971 F.2d at 870 ("A municipal agency may not be held liable under § 1983 simply for the

isolated unconstitutional acts of its employees.").  Instead, "in assessing whether it can be

inferred that municipal policymakers acquiesced in unconstitutional conduct of a subordinate

employee, it is important to analyze the severity and scope of the unconstitutional conduct by the

employee or multiple employees."  *Lucente*, 980 F.3d at 298.

Here, Jane Doe 1 pleads sufficient facts to infer that the County had an informal policy,

or custom, of tolerating sexual abuse and harassment by corrections officers, which directly led

to her own constitutional violations.[14]  Jane Doe 1 alleges that, during her incarceration in the

Jail, she was sexually harassed by Kezek, Taggart, and John Doe 1, (*see supra* Section I.B.3.),

and that it was "the culture of the facility[] for many officers to . . . make inappropriate sexual

comments both directly and indirectly to inmates," (SAC ¶ 172; *see supra* Section I.B.9).

Further, the SAC contains allegations that, over a seven-year period, at least five other inmates

were continually abused and harassed in substantially similar ways by at least nine separate

---

[14] Although all claims other than those asserted by Jane Doe 1 are time barred, (*see supra* Section II.B.2), given that Jane Doe 1 "has alleged both the existence of an ongoing policy of [harassment and abuse] and some non-time-barred acts taken in furtherance of that policy," the Court will consider the time-barred acts alleged by the other Plaintiffs as context when analyzing the merits of Jane Doe 1's *Monell* claim.  *See Ciotti v. City of New York*, No. 23-CV-10279, 2025 WL 308022, at *20 (S.D.N.Y. Jan. 27, 2025) (citing *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)); *Murray v. New York City*, No. 19-CV-1959, 2019 WL 4053951, at *3 n.2 (S.D.N.Y. Aug. 28, 2019) (noting, in a § 1983 action, that "untimely claims of sexual harassment may be introduced as evidence in a case involving timely claims"); *cf. Siclari v. N.Y.C. Dep't of Educ.*, No. 19-CV-7611, 2020 WL 7028870, at *7 (S.D.N.Y. Nov. 30, 2020) (noting, while evaluating an ADEA claim, that "untimely allegations may provide background evidence in support of a timely claim" (internal quotation marks omitted)); *Allen v. New York City Dep't of Env't Prot.*, 51 F. Supp. 3d 504, 510 n.2 (S.D.N.Y. 2014) (noting, in the context of a Title VII action, that the untimely "adverse employment decisions [p]laintiff asserts may provide context and support for the timely claims that [p]laintiff asserts").

officers (including the son of one of the Jail's supervisors). (*See supra* Section I.B.4–8.) The SAC also contains allegations that apart from the specific instances alleged, there was a widespread culture of officers coercing female inmates into trading sexual favors for contraband or benefits to the inmates, as well as a culture of officers making sexually inappropriate or disparaging remarks to or about female inmates. (*See supra* Section I.B.9.) Thus, Jane Doe 1 "has not alleged one isolated incident of . . . misconduct," but instead, "has alleged multiple incidents over a long, continuous time period." *Michael v. County of Nassau*, No. 09-CV-5200, 2010 WL 3237143, at *4 (E.D.N.Y. Aug. 11, 2010); *see also DiPippo v. County of Putnam*, 2019 WL 1004152, at *9 (S.D.N.Y. Feb. 28, 2019) (finding a plaintiff adequately plead a *Monell* claim where he "pleaded ample specific facts indicating that [d]efendants used extremely similar coercive investigative techniques on at least six witnesses"); *cf. Lucente*, 980 F.3d at 298 (reversing a grant of summary judgment in favor of a municipality where one officer was alleged to have sexually assaulted and harassed six inmates over eighteen months, and where "the record [was] replete with evidence of . . . sexual harassment of female inmates on a regular basis" by the same officer); *Rutherford v. City of Mount Vernon*, 698 F. Supp. 3d 574, 612 (S.D.N.Y. 2023) (finding plaintiffs could sustain, at summary judgment, a widespread practice theory of *Monell* liability when they proffered evidence of fourteen complaints of police misconduct, eight of which occurred over a 36-month period, that "detail[ed] substantially similar conduct on the part of the [police]").

Moreover, the fact that much of this alleged conduct occurred in areas that were subject to supervisory visits, (SAC ¶¶ 107–11), "suggests that the officers involved did not fear supervisory personnel observing their conduct, intervening to stop them, or subjecting them to disciplinary action for their misdeeds," *Michael*, 2010 WL 3237143, at *4 (allegations that

corrections officers failed to "regularly patrol the tiers/areas to which they were assigned" suggested "inattention to or knowing acquiescence in misconduct by law enforcement personnel," thereby successfully pleading a widespread practice or custom (citing *Bangura v. County of Nassau*, No. 07-CV-2966, 2009 WL 57135, at *1 (E.D.N.Y. Jan. 6, 2009))).   In other words, these allegations suggest that the Individual Defendants' abusive behavior was "not isolated, but rather was severe, persistent, and pervasive conduct that was executed in a manner that would have been difficult to conceal from supervisory personnel at the [Jail], including policymakers."  *Cf. Lucente*, 980 F.3d at 297–99 (reversing a grant of summary judgment in favor of a municipality because a corrections officer's misconduct was so blatant as to be "open and notorious," thus "constructively support[ing] the inference that policymakers . . . had a custom or practice of acquiescing to [the] sexual misconduct"); *see Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 63 (2d Cir. 2014) ("[B]ased on the pervasiveness of the harassment and the lack of response, the jury could reasonably have found that [the policymaker's] inaction and acquiescence to the harassment that [the plaintiff] suffered allowed the harassment to become the custom and practice, if not the policy, of the [municipality].").

The County argues that because "[p]leadings articulating only isolated instances of unconstitutional behavior do not plausibly allege a well-settled custom, . . . the SAC's allegations that certain rogue officers engaged in sexual misconduct" fail to plead a widespread custom or practice.  (County's Mem. 27–28.)  Although the Court agreed when granting the County's Motion to Dismiss the First Amended Complaint ("FAC") that "[s]everal instances of alleged sexual harassment [as to Jane Doe 1] and additional instances of disparaging comments involving different low-level defendants, as troubling as they may be, are insufficient to support a claim of a widespread pattern or practice," (Op. & Order 19–20 (citations omitted)), the SAC

contains far more robust allegations, including multiple, specific instances of abuse allegedly perpetrated by multiple defendants against multiple female inmates over an extended period of time. Thus, Jane Doe 1 has not merely "alleg[ed] [her] own experiences and then extrapolat[ed] them] to the entire jail population." *See Williams v. Fryermuth*, No. 23-CV-2156, 2024 WL 4557444, at *5 (S.D.N.Y. Oct. 23, 2024) (dismissing *Monell* claim where plaintiff only alleged specific misconduct done to her); *Douglas v. City of Peeksill*, No. 21-CV-10644, 2023 WL 2632217, at *9 (S.D.N.Y. Mar. 24, 2023) (dismissing *Monell* claim where plaintiff identified only isolated instances of constitutional violations). Instead—in addition to the general allegations about the Jail's culture of harassment—Jane Doe 1 has alleged over fifteen specific instances of sexual abuse and/or harassment (many of which were allegedly to be recurring), perpetrated by nine identified officers against six female inmates. Accordingly, at this stage of the litigation, she has adequately plead a widespread practice or custom sufficient to establish *Monell* liability.[15] *See DiPippo*, 2019 WL 1004152, at *9 (denying a motion to dismiss and noting "a *Monell* claim, based on a widespread custom or policy, must be context-specific and cannot be reduced to an overly simplistic analysis of the number of instances alleged"); *see also Michael*, 2010 3237143, at *4–5 (allowing municipal liability claim to proceed where the allegations consisted of "multiple incidents over a long, continuous period of time" that involved "multiple officers"); *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 738 (S.D.N.Y. 2012)

---

[15] The Court notes that, at this stage, Jane Doe 1 is not required to "identify a specific policymaker who promulgated a policy or custom or an express rule or regulation," as "it is enough" at this "context-specific" stage "to plead that a city had a general unconstitutional policy," as a "plaintiff has "no realistic way to learn about a municipality's training programs without discovery." *DiPippo*, 2019 WL 1004152, at *9 (internal quotation marks omitted); *see also Michael*, 2010 3237143, at *4 (noting that "[p]laintiff's Complaint [does not] identify a policymaker who promulgated such a policy or custom through his acts[,] [b]ut, at least at [the motion to dismiss] stage, the law does not require him to do so" (citing *Patterson v. County of Oneida, New York*, 375 F.3d 206, 226 (2d Cir. 2004))).

(denying the City's motion to dismiss where the plaintiff "points to over fifteen cases where City prosecutors allegedly committed misconduct, and alleges the existence of many more such cases in the form of unpublished opinions"); *cf. Jones*, 691 F.3d at 85 (finding that evidence of "two instances, or at most three, over a period of several years . . . fell far short of showing a policy, custom, or usage"); *Ayyaz v. City of New York*, No. 19-CV-1412, 2021 WL 1225684, at *3 (S.D.N.Y. Mar. 31, 2021) (denying a *Monell* claim where plaintiff only alleged "sexual harassment or discrimination incidents . . . involving herself" and two defendants); *White v. City of New York*, 206 F. Supp. 3d 920, 938 (S.D.N.Y. 2016) (finding six incidents over five years insufficient to plausibly allege the existence of a municipal policy).[16]

### b. Failure to Train

Jane Doe 1 also argues that *Monell* liability attaches because the County "fail[ed] to provide adequate training . . . [to its] subordinates so much so that it amounted to the County's deliberate indifference." (Pls' Opp'n 33.) The Court disagrees.

---

[16] The County argues that, because Taggart and Kezek were disciplined and prosecuted once caught, "[s]uch conduct is incompatible with a theory that the County was aware of a widespread pattern of sexual misconduct by corrections officers and failed to act." (County's Mem. 29 (citing Op. and Order at 21).) The County is correct that it acted to correct Taggart and Kezek's abuse once it became aware of those officers' actions in 2019, (SAC ¶¶ 184, 189, 193), and that the Court found that those allegations in the FAC were sufficient to defeat Jane Doe 1's *Monell* claim, (Op. and Order at 21). However, the County overlooks that the SAC is not restricted *only* to Taggart and Kezek's behavior vis-à-vis Jane Doe 1. Instead, the SAC is replete with allegations of blatant and pervasive abuse and harassment committed by Kezek against other female inmates, as well as such abuse committed by multiple other Individual Defendants for years prior to the County's intervention as to Taggart and Kezek. (*See* supra Section I.B.4– 9.) In other words, that the County eventually disciplined two of the nine officers involved in the alleged conduct, after the abuse was committed—and only did so for their behavior as to one victim—does not, at this stage, undermine the inference that the County constructively acquiesced to the pattern of sexual abuse. *See Castilla v. City of New York*, No. 09-CV-5446, 2012 WL 3871517, at *5 (S.D.N.Y. Sept. 6, 2012) (noting, in denying a motion to dismiss a *Monell* claim, that "the issue of whether the City eventually investigates and disciplines employees accused of misconduct is distinct from whether the City was deliberately indifferent to the violation of citizens' constitutional rights in the first place").

*Monell* liability can exist "'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" *Fraser v. City of New York*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)). This requires a showing that policymaking officials were deliberately indifferent. *Doe v. City of New York*, No. 18-CV-670, 2018 WL 3824133, at *8 (E.D.N.Y. Aug. 9, 2018). To make out a failure to train claim, a plaintiff must

> establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also . . . identify a specific deficiency in the city's training program and establish that deficiency is "closely related to the ultimate injury," such that it "actually caused" the constitutional deprivation.

*Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (quoting *City of Canton*, 489 U.S. at 391). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Brown*, 520 U.S. at 410). In other words, "the official made a conscious choice, and was not merely negligent." *Jones*, 691 F.3d at 81 (citations omitted). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

Jane Doe 1's primary argument is that the County was aware that female prisoners faced a high risk of sexual abuse—based upon "the prevalent amount of studies that demonstrate sexual inappropriateness among prisons, the enactment of PREA," and Ventillo's 2016 arrest in connection with the death of a former inmate—but that the County failed to adequately train its employees to prevent such abuse. (Pls' Opp'n 36.) However, the Second Circuit has made clear "that a plaintiff may not establish municipal liability under a failure-to-train theory without identify[ing] a specific deficiency in the city's training program and establish[ing] that [the]

deficiency is closely related to the ultimate injury, such that it actually caused the constitutional

deprivation." *Noonan v. City of New York*, No. 14-CV-4084, 2015 WL 3948836, at *4

(S.D.N.Y. June 26, 2015) (internal quotation marks omitted) (citing *Amnesty Am.*, 361 F.3d at

129–30). Jane Doe 1 fails to do so here, as her assertions that "Individual Defendants' conduct

and choices could of and would have been different had it been for appropriate training on . . .

[PREA]," (SAC ¶ 324), are insufficient to plausibly allege that any specific training deficiencies

caused her injury, *see Williams*, 2024 4557444, at *6 (dismissing a failure to train claim where

plaintiff "does not, for instance, allege deficiencies with procedural manuals or training guides"

or "highlight relevant particular aspects of [the jail's] training" but instead, "merely accuses [the

county] of failing to properly train and monitor its staff" (alterations, quotation marks, and

citations omitted)); *Taranto v. Putnam County*, No. 21-CV-2455, 2023 WL 6318280, at *19

(S.D.N.Y. Sept. 28, 2023) (dismissing a failure to train claim "based on a threadbare description

of the County's training," which "is the type of conclusory claim that courts routinely dismiss");

*Dumel v. Westchester County*, No. 19-CV-2161, 2021 WL 738365, at *6 (S.D.N.Y. Feb. 25,

2021) (dismissing failure to train claim where "[p]laintiff's general claim that the County failed

to train . . . its staff is a boilerplate assertion that is insufficient, without more, to state a *Monell*

claim" (internal quotation marks omitted) (alterations adopted)); *Marte v. N.Y.C. Police Dep't*,

No. 10-CV-3706, 2010 WL 4176696, at *3 (S.D.N.Y. Oct. 12, 2010) (granting a motion to

dismiss where plaintiffs did "not ple[a]d any facts that plausibly allege a specific deficiency in

the training . . . program that accounts for deprivation of their constitutional rights"").

Accordingly, Jane Doe 1 has not alleged a specific training deficiency sufficient to survive a

motion to dismiss.

Further, even had she alleged a specific deficiency, Jane Doe 1 has not "establish[ed] that that [training] deficiency caused the constitutional deprivation," (i.e., the sexual abuse), *Taranto*, 2023 WL 6318280, at *19 (quoting *Benn v. City of New York*, No. 18-CV-722, 2021 WL 3193022, at *6 (S.D.N.Y. July 28, 2021)), as Jane Doe 1 offers no allegations sufficient to suggest that interacting with female inmates "will frequently confront [corrections officers] with difficult choices of law that would be alleviated by training, and no evidence that making the wrong choice will frequently deprive [the inmates] of their constitutional rights," *Castilla*, 2012 WL 5510910, at *6 (denying a failure to train claim at summary judgment). Put differently, "deciding not to rape someone is not the kind of difficult choice of the sort that training . . . will make less difficult." *Doe*, 2018 WL 3824133, at *9 (quotation marks omitted) (quoting *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992)); *see Noonan*, 2015 WL 3948836, at *4 ("The decision to commit a sexual assault—a blatantly criminal act—cannot reasonably be seen as posing the type of 'difficult choice' contemplated by the Second Circuit in *Walker*."); *Castilla*, 2012 WL 5510910, at *6 ("It beggars common sense to posit that [an individual defendant] faced a difficult choice as to whether or not to coerce sex from [plaintiff] and that training would have alleviated that conundrum.").[17]

Accordingly, Jane Doe 1 has not adequately pled a failure to train claim.

> ### c. Failure to Supervise

Jane Doe 1 further argues that the County is liable for failing to properly supervise its employees. (*See* Pls' Opp'n 34–37.) Specifically, Jane Doe 1 alleges multiple deficiencies in

---

[17] Jane Doe 1 also attempts to make out a failure to train theory based on the Jail's alleged failure to train the *inmates* on how to report sexual abuse. (*See* SAC ¶¶ 335–42.) However, Jane Doe 1 proffers no legal argument and cites no authority for why the Court should accept this theory of *Monell* liability based on failure to train a third party, and as such, the Court will not consider it here.

the Jail's supervision of its corrections officers, specifically, that there was: (1) no actual monitoring of contraband; (2) an insufficient number of cameras and an insufficient monitoring of existing cameras; (3) inadequate unannounced supervisory rounds; (4) no enforcement of any disciplinary policy for officers who failed to report abuse; (5) widespread fear of reporting among inmates due to "poor policies"; and (6) no gender specific practices, dual officer requirements, or prohibitions on time spent with inmates.  (*Id.* at 36–37.)  Jane Doe 1 also alleges that the risk of officers sexually exploiting female inmates was obvious, given the "coercive power that corrections officers wield over incarcerated women" and that all sexual activity "between incarcerated individuals and correctional staff" has been criminalized by state law. (SAC ¶ 63.)  This claim, too, fails.

"To establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations."  *Lopes v. Westchester County*, No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020) (citation omitted).  To establish deliberate indifference for a failure to supervise claim, a plaintiff

> must show that "the need for more or better supervision to protect against constitutional violations was obvious," which may be established "through proof of repeated complaints of civil rights violations . . . if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."

*Taranto*, 2023 WL 6318280, at *20 (quoting *Buari v. City of New York*, 530 F. Supp. 3d 356, 400 (S.D.N.Y. 2021)).  "[A]n allegation of numerous claims of [the underlying constitutional wrong] by itself is insufficient to raise an inference of deliberate indifference due to failure to supervise."  *Tieman*, 2015 WL 1379652, at *21.

42

As the Second Circuit recognized in *Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011), given the unique context of the correctional environment and the power imbalances therein, the relevant question here is not whether the County "should have realized the need for . . . a prohibition" on sexual activity between corrections officers and female inmates, but

> whether defendants could rely simply on guards' awareness of these criminal laws (and . . . policies implementing them) to deter sexual exploitation of prisoners, or whether defendants had reason to know that *more was required* to discharge their affirmative protective duty, specifically, precluding or at least monitoring one-on-one contact between guards and prisoners. . . . Thus, the deliberate indifference concern here is with the adequacy of defendants' own actions to *prevent* sexual contact between guards and prisoners consistent with their affirmative duty to protect prisoners in their custody.

*Id.* at 335–36 (emphases added).  Because the plaintiff in *Cash* had proffered evidence that, prior to the assault at issue, another detainee had complained of similar misconduct by prison guards, to which the county only responded by issuing a one-page memorandum reminding personnel of the facility's "no-contact" policy, *id.* at 330–31, the Second Circuit concluded that a jury could have found that the county should have taken more proactive steps to counter the abuse, *id.* at 336, 339.

Even drawing all inferences in Jane Doe 1's favor, the allegations in the SAC do not demonstrate the County had reason to know that more was required of its policies to prevent the alleged constitutional violations.  Although *Cash* confirmed "that a *single*, prior report of sexual abuse at the relevant facility would have put the policymaker on notice that 'mere proscriptions on sexual contact between guards and prisoners had proved an insufficient deterrent to sexual exploitation,'" *Pusepa v. Annucci*, No. 17-CV-1765, 2019 WL 690678, at *6 (S.D.N.Y. Feb. 19, 2019) (emphasis in original) (quoting *Cash*, 654 F.3d at 336), here, Jane Doe 1 does not allege that there were *any* reports prior to the abuse she suffered that would have put the County on

notice that their supervisory policies were insufficient, let alone reports that the County ignored, *see Kovalchik v. City of New York*, No. 09-CV-4546, 2014 WL 4652478, at *4 (S.D.N.Y. Sept. 18, 2014) (dismissing *Monell* claim and noting that "[c]entral to [the] conclusion [in *Cash*] was evidence that prior to the sexual assault at issue, another detainee complained of sexual misconduct by prison guards").  Indeed, the only allegation that the County was on actual notice of a specific instance of sexual misconduct related to a Jail employee—prior to its eventual investigations into Taggart and Kezek—was Ventillo's arrest.  (*See* SAC ¶ 217.)  However, Ventillo's misconduct, unlike the misconduct reported in *Cash*, occurred *outside* the Jail with a *former* inmate no longer in custody.  (*See id*.)  Given that Ventillo's behavior thus occurred in an environment removed from the Jail's supervisory systems, and with someone who was no longer directly subject "to the inherent power differential between guards and prisoners," *Cash*, 654 F.3d at 337, this single incident is insufficient to put the County on notice "such that the need for corrective action or supervision was obvious," *id.* (quoting *Amnesty Am.*, 361 F.3d at 128).

Accordingly, because Jane Doe 1 does not allege facts sufficient to infer the County was on notice that current policies "had proved an insufficient deterrent to sexual exploitation," and was deliberately indifferent to the risk of perpetuating those policy, her failure to supervise claim fails.[18]  *Cash*, 654 F.3d at 336*; see Williams*, 2024 WL 4557444, at *7 (rejecting plaintiff's

---

[18] Moreover, to the extent Jane Doe 1 argues that the County demonstrated deliberate indifference by not implementing a policy "requir[ing] segregation of correctional officers from opposite-sex inmates," (SAC ¶ 343), accepting this argument would functionally "create a per se rule . . . that corrections officers and prisoners of the opposite sex could never be left in unmonitored one-on-one interactions—a rule the Second Circuit explicitly rejected in *Cash*," *Williams*, 2024 WL 4557444, at *7 (citing *Cash*, 654 F.3d at 336 (taking "no exception to the district court's [] observation" that "a policy permitting unmonitored one-on-one interactions between a guard and a prisoner of different sexes was not itself unconstitutional")).  Although the Court notes the obvious wisdom behind enacting such a policy, the Court declines to create a rule requiring it.

reliance on *Cash* where plaintiff had not pled the county was on notice of prior instances of

sexual abuse); *Khapesi v. City of New York*, No. 13-CV-4391, 2014 WL 2605342, at *7

(S.D.N.Y. June 10, 2014) (rejecting plaintiff's reliance on *Cash* to support the argument that

"allowing clergy to be alone and unmonitored in visits . . . constitutes a moral certainty of sexual

temptation" and that "inmates in unmonitored sessions with clergy will be sexually abused"); *see*

*also Taranto*, 2023 WL 6318280, at *20 (noting that plaintiffs' failure to allege "any prior lack

of investigation into or disciplining of [the individual defendant], or any other officer for that

matter, . . . dooms their claim"); *Esperanza v. City of New York*, 325 F. Supp. 3d 288, 309

(E.D.N.Y. 2018) ("Plaintiffs do not allege any specific facts regarding whether the [c]ity

investigated or disciplined [defendant police officer] in response to the complaints of excessive

force."); *Walker v. City of New York*, No. 14-CV-808, 2015 WL 4254026, at *11 (S.D.N.Y. July

14, 2015) (noting that "[e]ven if [the] [p]laintiff had shown an obvious need for more or better

supervision by listing the numerous lawsuits and complaints, he has not stated any facts to show

that the [c]ity has acted with deliberate indifference" where "he does not specifically claim that

the [c]ity failed to investigate the list of lawsuits").[19]

---

[19] The Court notes that, superficially, there may seem to be tension between this conclusion and the Court's conclusion regarding Jane Doe 1's widespread practice theory. However, "[w]hile particular facts supporting each claim are certainly related, the theories are distinct." *Rutherford*, 698 F. Supp. 3d at 617 (denying summary judgment on a failure to train, investigate, and supervise theory of liability but granting summary judgment on a widespread practice theory); *Buari*, 530 F. Supp. 3d at 408 (same, on a motion to dismiss). Moreover, unlike a widespread practice claim, a failure to train or supervise claim has "a heavy burden of proof to show that the municipality's response was so patently inadequate to the task as to amount to deliberate indifference." *Rutherford*, 698 F. Supp. 3d at 616 (quotation marks omitted) (quoting *Floyd v. City of New York*, 813 F. Supp. 2d 417, 441 (S.D.N.Y. 2011)); *see also DiPippo*, 2019 WL 1004152, at *9 ("[T]he pre-discovery pleading standard for a custom or practice is not a high bar.").

       d.   Failure to Intervene (Count Six)

The County also seeks to dismiss Jane Doe 1's claims for failure to intervene, insofar as it is asserted against the County, on the grounds that she fails to state a claim. (*See* County's Mem. 33–35.) The Court agrees.

Jane Doe 1 does not respond to the County's arguments, (*see generally* Pls' Opp'n), which, by itself, constitutes a waiver of the failure to intervene claim, *see Johnson v. AFNI, Inc.*, No. 22-CV-2930, 2023 WL 2970919, at *1 (S.D.N.Y. Apr. 15, 2023) ("[T]he plaintiff's failure to respond to the defendants' motions to dismiss is enough on its own to justify dismissal of the complaint, because [t]he failure to oppose a motion to dismiss a claim is deemed abandonment of the claim." (internal quotation marks omitted)); *see also Johnson v. City of New York*, No. 15-CV-8195, 2017 WL 2312924, at *17 (S.D.N.Y. May 26, 2017) (collecting cases); *Youmans v. Schriro*, No. 12-CV-3690, 2013 WL 6284422, at *5 (S.D.N.Y. Dec. 3, 2013) ("Plaintiff's failure to respond to contentions raised in a motion to dismiss . . . constitutes an abandonment of those claims.").

Moreover, Jane Doe 1 has failed to adequately plead a failure to intervene claim. "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *Harris v. City of Newburgh*, No. 16-CV-2731, 2017 WL 4334141, at *9 (S.D.N.Y. Sept. 27, 2017) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)); *McClean v. County of Westchester*, No. 17-CV-4492, 2018 WL 6329420, at *19 (S.D.N.Y. Dec. 3, 2018) (same), *aff'd sub nom. McClean v. City of Mount Vernon*, 776 F. App'x 725 (2d Cir. 2019). To establish liability under this theory, a plaintiff must show that: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's

constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *McClean*, 2018 WL 632942, at *19 (citations omitted).

Here, Jane Doe 1 only alleges that the County and the Individual Defendants "had a reasonable opportunity to prevent the violations of [her] Constitutional rights but failed to intervene." (SAC ¶ 378.) She does not point to any specific officer that had such an opportunity to prevent her abuse at the hands of Taggart and Kezek, nor identify any specific individual that failed to do so. Such conclusory allegations do not suffice to state a failure to intervene claim and accordingly, the claim must be dismissed. *See Case v. City of New York*, 233 F. Supp. 3d 372, 402 (S.D.N.Y. 2017) (dismissing a failure to intervene claim where the "broad allegations" in the complaint "fail to raise a reasonable inference that [any defendant] had a realistic opportunity to prevent" the constitutional violations (internal quotation marks omitted)); *Bouche v. City of Mount Vernon*, No. 11-CV-5246, 2012 WL 987592, at *7 (S.D.N.Y. Mar. 23, 2012) (dismissing failure to intervene claim where "[plaintiff] only refers to the defendants in the collective, never identifying which defendants were responsible for specific actions" and "failed to state who or how defendants failed to intervene").[20]



~\*~\*~\*~

---

[20] Jane Doe 1 also asserts a *Monell* theory for reckless disregard (Count Five). (*See* SAC ¶¶ 368–76.) However, in her Opposition, she fails to respond to the County's arguments on the deficiencies of this claim, thus abandoning the claim. *See, e.g.*, *Johnson*, 2023 WL 2970919, at *1. Moreover, in the passing mentions of this claim in her Opposition, she expressly links it to her failure to train and supervise claims, which, as discussed above, both fail. (*See* Pls' Opp'n 4 n2. ("It should be noted that the link to reckless disregard under *Monell* liability is through [the County's] negligent behavior, including but not limited to [their] failure to train and supervise."); *id.* at 6 ("The lack of supervision and intervention of this facility raised to the level of gross negligence [and] reckless disregard . . . . (emphasis removed)).") Accordingly, the Court also dismisses this claim.

In sum, while Jane Doe 1 has not plausibly alleged *Monell* liability based upon a failure to train, supervise, or intervene, she has plausibly alleged a widespread practice or custom. Thus, the County's Motion is denied as to her *Monell* claims asserted in Count Three.[21]

### 4.  State Law Claims[22]

#### a.  Sexual Misconduct Claims (Counts Seven Through Ten)

Jane Doe 1 also alleges four causes of action arising under state law in relation to the sexual misconduct (i.e., common law assault and battery and violations of New York Penal Law §§ 130.65, 130.60, and 130.55.  (*See* SAC ¶¶ 381–415.)  The County argues these claims should

---

[21] Because the County offers no argument why Jane Doe 1's §§ 1985 and 1986 claims fail independent of her § 1983 claims, the Court will not dismiss those claims.  *See Myun-Uk Choi v. Tower Rsch. Cap., LLC*, 890 F.3d 60, 69 n.5 (2d Cir. 2018) ("Defendants did not raise this argument in their motion to dismiss the amended complaint and it is therefore waived."); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634 n.93(S.D.N.Y. 2014) (noting arguments not made in memorandum of law in support of motion to dismiss are waived).

However, as the Court noted in its prior Opinion, to the extent Jane Doe 1 asserts a *Monell* claim based on alleged violations of her Eighth Amendment rights, that claim fails because she was a pre-trial detainee when the conduct at issue occurred.  (*See* Op. & Order 17–18 n. 11 (citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment."), and *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d. Cir. 2007) ("Pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." (internal quotation marks omitted)), *rev'd on other grounds* 556 U.S. 662 (2009)); *see also* County Mem. 25 (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).)  Jane Doe 1 offers no contrary support nor attempts to explain why she did not correct this deficiency when amending the Complaint.  Indeed, Jane Doe 1 explicitly alleges that she "was a pre-trial detainee when the sexual assaults occurred."  (SAC ¶ 281.)

[22] In light of the Court's dismissal of Jane Does 2 through 6's federal claims, the Court declines to exercise supplemental jurisdiction over their remaining state law claims.  *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) (summary order) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims . . . ."); *Young v. Suffolk County*, 922 F. Supp. 2d 368, 398 (E.D.N.Y. 2013) (declining to exercise supplemental jurisdiction over state-law counterclaim after dismissing all federal claims).

be dismissed because sexual assault is outside the scope of employment.  (County's Mem. 35–36.)  The Court agrees.

"Under the doctrine of respondeat superior, an employer may be vicariously liable for the tortious acts of its employees only if those acts were committed in furtherance of the employer's business and within the scope of employment."  *Doe*, 2018 WL 3824133, at *6 (quoting *N.X. v. Cabrini Med. Ctr.*, 765 N.E.2d 844, 847 (N.Y. 2002)); *Noonan*, 2015 WL 3948836, at *7 ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." (quoting *Adorno v. Corr. Servs. Corp.,* 312 F.Supp.2d 505, 517 (S.D.N.Y. 2004)).  Sexual assault and harassment "is not in furtherance of [an employer's] business and is a clear departure from the scope of employment, having been committed for wholly personal motives."  *Doe*, 2018 WL 3824133, at *6.  Accordingly, the County cannot be held vicariously liable for the abuse Taggart and Kezek allegedly committed against Doe, even though such abuse was committed in their place of employment.  *See id.* (dismissing state law claims for sexual assault and battery as far as they were asserted against a municipality); *Noonan*, 2015 WL 3948836, at *7 (S.D.N.Y. June 27, 2015) ("Because [p]laintiff's alleged injuries stem from the sexual assault by [the defendant officer], and because New York courts have consistently held that sexually motivated conduct falls outside the scope of employment, [p]laintiff fails to state a claim based on a respondeat superior theory of liability." (italics omitted)).

Accordingly, Jane Doe 1's state law claims for assault and battery, and violations of New York Penal Law §§ 130.65, 130.60, and 130.55 are dismissed insofar as they are asserted against the County.

b.  <u>Emotional Distress Claims (Counts Eleven and Twelve)</u>

Jane Doe 1 also asserts claims for Intentional Infliction of Emotional Distress ("IIED")

and Negligent Infliction of Emotional Distress ("NIED").  (*See* SAC ¶¶ 416–29.)  These claims,

too, fail against the County.

First, as to her claim of IIED, "[i]t is well settled that public policy bars claims sounding

in intentional infliction of emotional distress against a governmental entity."  *Noonan*, 2015 WL

3948836, at *7 (quoting *Lauer v. City of New York,* 240 A.D.2d 543, 544 (N.Y. App. Div.

1997)); *see also Doe*, 2018 WL 3824133, at *10 (same); *J.H. v. Bratton*, 248 F. Supp. 3d 401,

416 n.10 (E.D.N.Y. 2017) (same).  Accordingly, this claim may only proceed against the

Individual Defendants and is barred against the County.

Second, as the County argues, Jane Doe 1's NIED claim is precluded by the Prison

Litigation Reform Act ("PLRA"), which states that "[n]o Federal civil action may be brought by

a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing

of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)."  42

U.S.C. § 1997e(e); *see Cano v. City of New York*, 44 F. Supp. 3d 324, 331 (E.D.N.Y. 2014)

(same).  "Sexual act," as defined, requires various forms of physical contact with genitalia.  18

U.S.C. § 2246(2)(A)–(D).  The conduct Jane Doe 1 alleges was committed by Taggart and

Kezek—although reprehensible—did not involve any such physical contact.  (*See* SAC ¶¶ 160–

87.)  Accordingly, Jane Doe 1 cannot sustain a claim for NIED based upon the conduct alleged

in the SAC.  *Cf. Watson v. Carver-Jordan*, No. 11-CV-2415, 2011 WL 6202899, at *4 (S.D.N.Y.

Dec. 13, 2011) (noting "[u]nder the [PLRA], a prisoner may not recover for mental or emotional

injuries unless he has shown physical injury," and dismissing a claim because "[plaintiff] will

not be able to make such a showing" (citing *Jenkins v. Haubert*, 179 F.3d 19, 28–29 (2d Cir. 1999))).

Accordingly, Count Eleven must be dismissed as against the County and Count Twelve must be dismissed as against all Defendants.

### c. Negligent Security (Count Thirteen)

Next, Jane Doe 1 alleges that the County is liable for her injuries by negligently failing to provide her with proper security.  (*See* SAC ¶¶ 430–36.)  This claim also fails.

"Under New York law, a tort plaintiff seeking to prove a defendant's negligence must show: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'"  *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 675 (S.D.N.Y. 2024) (quoting *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023)).  As an initial matter, Jane Doe 1 has abandoned this claim by failing to respond to the County's arguments.  *Doe*, 2018 WL 3824133, at *6 n.4 (deeming a claim abandoned where plaintiffs' "only response . . . comes in a section heading" while the "body text of th[at] section" addresses a different issue); *see also Johnson*, 2023 WL 2970919, at *1 ("[T]he failure to oppose a motion to dismiss a claim is deemed abandonment of the claim."). Moreover, Jane Doe 1's allegations that the County "breached" its duty of care to her "by failing to provide [her] with proper, adequate, or sufficient security," (SAC ¶ 432), are, without more, insufficient to make out a negligence claim, *see Doe*, 2018 WL 3824133, at *7 (rejecting a negligence claim where plaintiff offered only "conclusory statements"); *cf. Hall v. City of White Plains,* 185 F.Supp.2d 293, 304 (S.D.N.Y. 2002) (dismissing state law negligence claim based on "nothing more than conclusory allegations").

d.  <u>Negligent Hiring, Supervision, Training, and Retention (Count Fourteen)</u>

Finally, Jane Doe 1 alleges that the County is liable for her injuries under a failure to supervise, retain, or train theory grounded in New York state law.  (*See* SAC ¶¶ 437–50.)  This claim also fails.

Under New York law, the tort of negligent hiring, retention, or supervision "applies equally to municipalities and private employers."  *Doe*, 2018 WL 3824133, at *7 (quoting *Gonzalez v. City of New York*, 17 N.Y.S.3d 12, 15 (N.Y. App. Div. 2015)).  To state a claim under this theory, a plaintiff must show:

> (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels.

*Noonan*, 2015 WL 3948836, at *8 (quoting *Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir. 2004)); *see Doe*, 2018 WL 3824133, at *7 (same).  With respect to the failure to train claim, "a cause of action sounding in negligence is legally sustainable against a city when the injured party demonstrates that he was injured due to the negligent training and supervision of a law enforcement officer."  *Noonan*, 2015 WL 3948836, at *8 (quoting *Barr v. Albany County*, 406 N.E.2d 481, 485 (N.Y. 1980)).  "To prevail on a state law failure to train claim, a plaintiff must set forth more than bare, conclusory allegations of a deficiency in training."  *Id.*; *see also Hall*, 185 F. Supp. 2d at 304 (dismissing state law failure to train claim based on "nothing more than conclusory allegations").

Here, Jane Doe 1 has failed to plausibly allege that the County was negligent under any of these theories because she has not alleged that the County knew (or should have known) of Taggart and Kezek's specific propensity to sexually harass female inmates.  Although Jane Doe

1 alleges a pattern of widespread behavior at the Jail, she does not allege that the County was on notice that Taggart and Kezek, specifically, posed a danger to herself or other inmates. Instead, she only alleges that the County "knew or had reason to know that Individual Defendants engaged in inappropriate conduct with female inmates." (*See* SAC ¶ 440; *see id.* ¶ 444 (alleging the County "knew of the individual defendant[s'] propensity to commit tortious acts").) "These are the type of conclusory statements that [the Court is] not bound to accept as true on a motion to dismiss and that do not suffice to state a plausible claim for relief." *Doe*, 2018 WL 3824133, at *7 (internal quotation marks and citations omitted); *see id.* (dismissing a negligence claim as plaintiff "provides no specific allegations of prior sexual misconduct by [the individual Defendants] that would have put . . . the [c]ity on notice that either detective posed a danger"); *Noonan*, 2015 WL 3948836, at *8 (dismissing a negligence claim where "[p]laintiff pleads no facts tending to show that the City knew or should have known of [the defendant officer's] alleged propensity to commit sexual assault or related wrongdoing"). And with respect to the negligent training claim, because, "as discussed with respect to [Jane Doe 1's] federal failure to train claim, [Jane Doe 1] has not identified any deficiency in police training nor pleaded facts sufficient to connect such a deficiency to her injuries," that claim must also fail. *See Noonan*, 2015 WL 3948836, at *8 (dismissing a state law claim for negligent training); *see also Rodriguez v. City of New York*, 649 F. Supp. 2d 301, 307–08 (S.D.N.Y.2009) (finding that conclusory allegations insufficient to sustain a § 1983 failure to train claim also "doom the plaintiff's [parallel] state law claim for failure to train").

### III.  Conclusion

For the foregoing reasons, the County's Motion to Dismiss is denied as to Jane Doe 1's *Monell* claims asserted in Count Three and is granted as to all other Counts, insofar as such Counts are asserted against the County.

Because this is the second adjudication on the merits of Plaintiffs' direct claims under the Constitution against the County and the Individual Defendants (Counts One, Two, and Four), the dismissal is with prejudice.  *See Chavez v. Gutwein*, No. 20-CV-342, 2022 WL 1487781, at *7 (S.D.N.Y. May 11, 2022) (dismissing with prejudice previously adjudicated claims as the plaintiff was not entitled to "a third go-around" (quoting *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978))); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the] [p]laintiff has already had two bites at the apple, and they have proven fruitless" (alteration and quotation marks omitted)).

Because Jane Doe 2 through 6's federal claims against the County and the Individual Defendants are time barred (Counts Three, Five, and Six), those claims are also dismissed with prejudice.  *See Perkins v. Perez*, No. 17-CV-1341, 2020 WL 248686, at *8 (S.D.N.Y. Jan. 16, 2020) (noting time-barred claims "were properly dismissed with prejudice").  The Court declines to exercise supplemental jurisdiction over Jane Doe 2 through 6's state law claims.

Because this is the first adjudication on the merits of Jane Doe 1's state claims (Counts Seven through Fourteen), the dismissal is without prejudice.  If Jane Doe 1 wishes to file an amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Jane Doe 1 must do so within thirty days of the date of this Opinion & Order.  *See Tyson v. Town of Ramapo*, No. 17-CV-4990, 2019 WL 1331913, at *19 (S.D.N.Y. Mar. 25, 2019) ("The Court will afford [p]laintiff an opportunity to amend if, after reviewing this Order and Opinion and the law therein, [s]he still believes that [s]he can plausibly state claims against Defendants." (alteration adopted) (citation omitted)).  There will be no extensions.  Jane Doe 1 is further advised that an amended complaint will completely replace, not supplement, the SAC.

Any amended complaint must therefore contain *all* of the claims, defendants, and factual allegations that Jane Doe 1 wishes the Court to consider. If Jane Doe 1 fails to timely file an amended complaint, the dismissed claims may be dismissed with prejudice.

The Court will hold a telephonic status conference on May 7, 2025, at 10:30 AM.

The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt. No. 91.)

SO ORDERED.

Dated:    April 2, 2025
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge